UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Ralph T. Knapp,                                    Civil No. 08-1284 (JRT/FLN)

    Plaintiff,

v.                                                 **REPORT AND RECOMMENDATION**

Matthew P. Vandergon, *et al.*,

    Defendants.

Phillip A. Smith for Plaintiff.
Stanford P. Hill for Defendants.

**THIS MATTER** came before the undersigned United States Magistrate Judge on January 16, 2009 on First Union Title and Real Estate Services, LLC, Michael Kielty, and Michelle Hutton's Motion for Summary Judgment [#40]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Defendants' Motion be DENIED.

**I.     BACKGROUND**

In the spring of 2005, Plaintiff Ralph T. Knapp was facing foreclosure on his home in Ely, Minnesota. (Am. Compl. ¶ 28.) Shortly thereafter, he met Defendant Matthew P. Vandergon who told Knapp that he could help him stay in his home. (*Id.* at ¶ 30.) On December 7, 2005, Plaintiff entered into a "Foreclosure Consulting Agreement" with Alternative Residential Resources ("ARR"), a company, 50% of which was owned by Matthew Vandergon. (Smith Aff. Ex. 1.) That agreement provided that, in exchange for $2,000, ARR would help Plaintiff find a way to obtain new financing for his home, including the possibility of helping to arrange a mortgage foreclosure reconveyance. (*Id.* at ¶ 1.) Purchasing a home out of foreclosure and selling it back to the prior

owner on a contract for deed is defined by Minn. Stat. § 325N.10, subd. 3 as a "foreclosure reconveyance."[1]  The Foreclosure Consulting Agreement identified Matthew Vandergon as the "Owner/Lending Consultant." (*Id.* at 3.) Matthew Vandergon first arranged for himself to purchase Plaintiff's home out of foreclosure and sell it back to Plaintiff on a contract for deed. (Am. Compl. ¶ 41.) However, after Matthew Vandergon could not obtain his own financing for the deal, he arranged for his wife, Lisa Vandergon, to purchase the home. (Am. Compl. ¶ 73; Affidavit of Phillip A. Smith ("Smith Aff.") Ex. 3, 5.)

Plaintiff alleged that prior to the closing on the foreclosure reconveyance, he asked Matthew Vandergon if the closing could be handled by a local title company Plaintiff had worked with in the past. (Am. Compl. ¶ 46.) According to Plaintiff, Mr. Vandergon refused to use the local company and insisted they use First Union Title and Real Estate Services, LLC ("First Union") for the closing because it was "the only title company who understood the foreclosure reconveyance transaction." (*Id.*)

---

[1] The statute defines foreclosure reconveyance as:
"Foreclosure reconveyance" means a transaction involving:

> (1) the transfer of title to real property by a foreclosed homeowner during a foreclosure proceeding, either by transfer of interest from the foreclosed homeowner or by creation of a mortgage or other lien or encumbrance during the foreclosure process that allows the acquirer to obtain title to the property by redeeming the property as a junior lienholder; and
>
> (2) the subsequent conveyance, or promise of a subsequent conveyance, of an interest back to the foreclosed homeowner by the acquirer or a person acting in participation with the acquirer that allows the foreclosed homeowner to possess either the residence in foreclosure or other real property, which interest includes, but is not limited to, an interest in a contract for deed, purchase agreement, option to purchase, or lease.

Minn. Stat. § 325N.10, subd. 3.

Plaintiff alleges that the closing was supposed to take place on December 30, 2005, but in the morning on that day, Michael Kielty, the owner of First Union, called Plaintiff and told him that the closing would have to be rescheduled because of the weather. (Am. Compl. ¶ 67; First Union Ans. ¶ 15.) Over Plaintiff's objection, the closing was rescheduled for January 3, 2006, the last day of the redemption period. (*Id.* at ¶ 68.)

On January 3, 2006, the closing commenced at 11:00 a.m. at First Union's office. (Am. Compl. ¶¶ 69, 72.) Plaintiff, Matthew Vandergon, First Union owner Michael Kielty, First Union employee Michelle Hutton, and Michael Gearman of Communty Residential Mortgage ("CRM") were present. (*Id.*) Michael Gearman was a mortgage broker for CRM and a 50% owner in ARR (Matthew Vandergon was the other 50% owner). (Ans. of Matthew P. Vandergon, et al., Dkt. 9 at ¶ 3.) Mr. Gearman arranged for the financing for Lisa Vandergon's purchase of Plaintiff's home in his capacity as mortgage broker for CRM. (Affidavit of Stanford Hill, HUD-1 at lines 801, 804, 805, 809.)

Plaintiff alleges that, at the closing, he signed not only the purchase agreement selling his house to Lisa Vandergon, but also the contract for deed identifying himself as purchaser and Lisa Vandergon as the seller. (Am. Compl. ¶ 73; Smith Aff. Ex. 3.) The contract for deed is dated January 3, 2006. (*Id.*) The purchase agreement between Knapp and Lisa Vandergon was prepared by Matthew Vandergon in his capacity as a real estate agent for Defendant Action West, Inc. (Smith Aff. Ex. 5.) Matthew Vandergon and/or Gearman chose First Union to do the closing even though Action West, Inc. had an affiliation with Anchor Title Services. (Smith Aff. Ex. 6.) Exhibit 6 is an Affiliation Disclosure stating that Action West has an affiliation with Anchor Title and recommends Anchor Title do the closing but the parties are not required to use the company as the closing agent.

This Affiliation Disclosure was signed by Lisa Vandergon on December 27, 2005. (*Id.*) Despite Action West's affiliation with Anchor Title and Knapp's request to use a local closing company, Matthew Vandergon and/or Gearman chose to use First Union.

Federal law requires that uniform settlement statements be prepared at closings of all real estate transactions "which involve federally related mortgage loans." 12 U.S.C. § 2603 (2009). The HUD-1 Settlement Statement prepared by First Union lists a $2,000 consultation fee to be paid to Alternative Residential Resources from seller's funds at settlement. (Hill Aff. Att. at 2.) It also lists an "Investors Agreement Fee" of $8,000 to be paid to Defendant MPV Homes, a company which is owned by Matthew Vandergon. (*Id.*; Vandergon Ans. ¶ 3.) The Investor Agreement entered into between Ralph Knapp and Lisa Vandergon on December 27, 2005 states that an Investor fee shall be paid at the time of reconveyance in the amount of $0.00, i.e., the contract indicates that no investor fee was to be paid at the time of reconveyance. (Smith Aff. Ex. 2 at ¶ 3.) Yet, MPV homes was listed as an investor on the HUD-1 form and, according to that form, was paid $8,000.

Plaintiff alleges that four hours after the closing, at 4:00 p.m. on January 3, 2006, Matthew Vandergon contacted him and said they would have to meet again at First Union's offices and re-sign documents because there had been problems with the earlier closing. (Am. Compl. ¶ 92.) Plaintiff alleges that at the second closing, in addition to himself, Matthew Vandergon, Lisa Vandergon, and First Union owner Michael Kielty were present. (Am. Compl. ¶ 93.) Plaintiff alleges that he and Lisa Vandergon signed the same mortgage documents that were provided by Defendant Argent at the first closing, and also signed another HUD-1 Settlement Statement which contained the same numbers as the one signed at the first closing. (Am. Compl. ¶ 94.) Plaintiff alleges that he was also presented with a "Option to Purchase Agreement for Residential Lease" in

4

which MPV Homes was identified as the seller/landlord and Plaintiff was identified as the buyer/tenant. (Am. Compl. ¶ 95.)

First Union denies that the contract for deed was signed at the closing and it denies any knowledge that Plaintiff and Lisa Vandergon entered into a contract for deed at the time of the closing. First Union simply claims that it "closed the transaction precisely according to the lender's instructions" and that the HUD-1 settlement statement "details every disbursement made by First Union Title, down to the penny." (First Union Mem. in Support at 6.)

The relationships between the Defendants go beyond this transaction. As mentioned previously, Matthew Vandergon and Gearman were co-owners of ARR. Gearman was also a mortgage broker from CRM which placed the mortgage for Lisa Vandergon when she purchased Plaintiff's home.

For all or some of the time between June 2006 and May 2007, First Union, CRM and Mr. Gearman had offices at the same location at 102 N. Chestnut, Chaska, MN. (Smith Aff. Ex. 7 at 5; Ex. 14 at 4.) For all or some of the time between April 2005 and May 2007, First Union conducted business at 13963 West Preserve Blvd., Burnsville, MN and CRM maintained an office at 13965 W. Preserve Blvd. Plaintiff claims that because CRM employee Gearman was also an owner of ARR, ARR also had a presence at CRM's Preserve Blvd. location.

Between July 2004 and August 2007, First Union conducted 30 new mortgage closings with CRM. (Smith Aff. Ex. 7 at 3.) Five of those transactions involved the Vandergons as purchasers. (*Id.*) Three of those five transactions involved foreclosure reconveyances: the Plaintiff's transaction, the Schuffenhauer transaction, and the Prigge transaction. (*See* Smith Aff. Ex. 12 at 5 (Prigge Transaction), Ex. 13 (Schuffenhauer Transaction). Another one involved a purchase of a

home out of foreclosure. (Smith Aff. Ex. 11 (Tessmer Transaction).) First Union employee Michelle Hutton appears to have been the closing agent on the Schuffenhauer and Prigge foreclosure reconveyances. What appears to be her signature is on a line under which the signor is identified as the "Settlement Agent" for First Union. (Smith Aff. Ex. 10 at 3, Ex. 9 at 3.) She also notarized the "Bill of Sale" in the Schuffenhauer deal and the notary stamp clearly states "Michelle Hutton" as the notary. (Smith Aff. Ex. 10 at 6-7.) In addition, First Union admits in its Answer that "defendant Hutton closed the transaction" in Plaintiff's case. (Answer of Defendants Kielty, Hutton and First Union Title at ¶ 74.) The Settlement Statement for Plaintiff's transaction submitted by Defendants Kielty, Hutton and First Union in support of their motion was however not signed by Hutton. (Hill Aff., Ex. at 3.) The signature appears to be that of Michael Kielty. (*Id.*)

Plaintiff claims that he has been denied access to the information on the remaining 26 closings done by First Union with CRM and has therefore been unable to determine if they involved foreclosure purchases. Plaintiff contends he has requested twice copies of front and backs of checks issued in connection with the 30 transactions "to verify evidence of distribution of money in these transactions," but none have been provided other than documentation of funds brought to the closing by Plaintiff and the Vandergons. (Pl. Response at 7.)

In this motion, First Union, its owner Michael Kielty and its employee Michelle Hutton (hereinafter referred to collectively as "First Union"), move for summary judgment on the claims against them. The claims are: (1) for various violations of the "Foreclosure Purchaser Statute" (Count Two); and (2) for fraud (Count Five). Because the Court finds a genuine issue of material fact with respect to Count Two, it does not address Count Five.

**II.     STANDARD OF REVIEW**

According to Federal Rule of Civil Procedure Rule 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to determine whether a certain fact is material, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "The inquiry performed is the threshold inquiry of determining whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250.

When determining whether to grant a motion for summary judgment, a court must view all of the facts in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). When the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).")

**III.     LEGAL ANALYSIS**

First Union contends that it should be granted summary judgment because, as a matter of law, real estate closing companies should not be held liable under Minn. Stat. § 325N.10.  Chapter 325N of the Minnesota Statutes sets forth a legal framework for purchasing a home out of foreclosure and then re-selling it to the prior owner.  Here Plaintiff alleges that First Union falls under the statutory definition of "foreclosure purchaser" and that it is liable for a number of violations of the statute including, but not limited to: (1) failing to provide proper documentation of the transaction in violation of § 325N.12; (2) failing to verify whether Plaintiff had a reasonable ability to make payments under the contract for deed in violation of § 325N.17(a)(1); and (3) engaging in conduct which caused confusion and/or mislead Plaintiff as to material aspects of the transaction, in violation of § 325N.17(d).   First Union  failed to dispute these allegations in any manner and therefore, for the purposes of this motion,  the Court takes the allegations of the statutory violations presented by Plaintiff to be true.

First Union contends that it does not fall under the definition of "foreclosure purchaser" and therefore should be granted summary judgment.  The statute defines a "foreclosure purchaser"as:

> a person that has acted as the acquirer in a foreclosure reconveyance. Foreclosure purchaser *also includes a person that has acted in joint venture or joint enterprise with one or more acquirers in a foreclosure reconveyance. . . .*

Minn. Stat. § 325N.10, Subd. 4 (emphasis added).  The parties do not dispute that a foreclosure reconveyance occurred in this case.

First Union contends that, as a matter of law, title companies and their employees cannot be considered "joint venturers" or "in joint enterprise" with an acquirer in a foreclosure reconveyance if they simply execute their duties in the ordinary course.  The elements of a joint venture are: (1)

8

contribution by all parties; (2) joint proprietorship and control; (3) sharing of profits but not necessarily losses; and (4) a contract. *Delgado v. Lohmar*, 289 N.W.2d 479, 482 (Minn. 1979). The elements of a joint enterprise are: (1) a mutual understanding for a common purpose; and (2) a right to a voice in the direction and control of the means used to carry out the common purpose. *Id.* Although, in most cases, title companies will perform their duties without entering into a joint venture or enterprise with an acquirer, the Court can imagine scenarios in which a title company could indeed enter into a joint venture or enterprise with an acquirer. For example, a title company might agree to overlook deficiencies in foreclosure reconveyances conducted by particular acquirers in exchange for the acquirer's agreement to use the title company as its sole provider of services. In this hypothetical scenario, the title company and the acquirer's agreement could meet the definition of a joint enterprise because they would have a mutual understanding for a common purpose beyond the simple closing of a transaction. Both parties would have a right to control the means used to carry out the purpose because the acquirer controls the formation of the deal and the title company controls the formal process of closing it and disbursing the funds to the appropriate parties.

**A.    There is a genuine issue of material fact regarding whether Defendants were acting in joint enterprise.**

Turning to the case before the Court, there are genuine issues of material fact as to whether First Union, CSM, and Matthew and Lisa Vandergon, were, at minimum, acting in joint enterprise with respect to the foreclosure reconveyance. As stated above, when the moving party brings forth a proper summary judgment motion, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for

trial." Fed. R. Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c).")  The elements of a joint enterprise are: (1) a mutual understanding for a common purpose; and (2) a right to a voice in the direction and control of the means used to carry out the common purpose. *Delgado*, 289 N.W.2d at 482.

### 1. There is a genuine issue of material fact with respect to whether First Union, CRM and the Vandergons had a mutual understanding for a common purpose.

The first issue is whether Plaintiff has established that a genuine issue exists concerning whether First Union, the Vandergons and CRM had a mutual understanding for a common purpose. Plaintiff has put forth evidence that: (1) First Union, the Vandergons and CRM engaged in three mortgage foreclosure reconveyance transactions together; (2) that First Union had knowledge Plaintiff and Lisa Vandergon were engaging in a mortgage foreclosure reconveyance; (3) that First Union listed an $8,000 Investors' Fee on the HUD-1 Settlement Statement to be paid to MVP, a company owned by Matthew Vandergon, even though the Investors' Agreement signed by the Plaintiff stated that there would be no investor fee; and (4) that the Vandergons and/or CRM insisted repeatedly on using First Union as the closing company.

More specifically, the evidence is as follows. Between July 2004 and August 2007, First Union conducted 30 new mortgage closings with CRM.  In five of those transactions, the Vandergons were the purchasers. (Smith Aff. Ex 7 at 3.)  Four of those five transactions involved purchases out of foreclosure, and evidence shows that three out of the four were foreclosure reconveyances.  One of these foreclosure reconveyances is the case at issue. First Union employee Michelle Hutton was involved in some capacity in all three foreclosure reconveyance transactions. In the Schuffenhauer and Prigge transactions, she signed as the closing agent.  In Plaintiff's

transaction, First Union admitted in its answer that Hutton was the closing agent even though the signature of the closing agent on the HUD-1 form appears to be that of Michael Kielty.

Plaintiff alleged that prior to the closing on the foreclosure reconveyance, he asked Matthew Vandergon if the closing could be handled by a local title company Plaintiff had worked with in the past. According to Plaintiff, Mr. Vandergon refused to use the local company and insisted they use First Union for the closing because it was the only title company that understood how to do foreclosure reconveyances. Furthermore, Matthew Vandergon and/or Gearman chose First Union to do the closing even though Action West, Inc. had an affiliation with Anchor Title Services. Matthew Vandergon was a real estate agent with Action West and was acting in his capacity as a real estate agent for Lisa Vandergon in the transaction.

The parties agree that First Union had the following duties at the closing: (1) to verify coordination of the purchase agreement terms with the lender's instructions and terms of the mortgage; (2) to obtain title insurance; (3) to collect and disburse funds as escrow agent; and (4) to oversee the closing. (Pl. Mem. at 7.)

First Union denies knowing that Plaintiff and Lisa Vandergon entered into a contract for deed on January 3, 2006, the day of the closing. Plaintiff, however, contends that the First Union owner Michael Kielty and First Union employee Michelle Hutton were present when the contract for deed was signed and therefore must have known about the contract for deed. Plaintiff alleges that at the first closing at which Defendants were present, he was "handed a Contract for Deed identifying himself at the purchaser and Defendant L[isa] Vandergon at seller" and that he signed it. (Am. Compl. ¶ 72-73, 76.) Exhibit 3 to the Affidavit of Phillip Smith, which accompanied Plaintiff's Response to Defendants' Motion for Summary Judgment, is a Contract for Deed, dated

11

January, 3, 2006 and is signed by Ralph Knapp and Lisa Vandergon. First Union claims that the Contract for Deed was signed some time after the closing and that they were unaware of it. (Mem. in Support of Summary Judgment Motion at 2.) Yet, HUD-1 Settlement Statement prepared by First Union lists a $2,000 consultation fee to be paid to Alternative Residential Resources from seller's funds at settlement. (Hill Aff. Att. at 2.) It also lists an "Investors[sic] Agreement Fee" of $8,000 to be paid to Defendant MPV Homes, a company owned by Matthew Vandergon. (*Id.*) This agreement to engage in a foreclosure reconveyance entered into between Ralph Knapp and Lisa Vandergon on December 27, 2005 states that an Investor fee shall be paid at the time of reconveyance in the amount of $0.00, i.e., the contract indicates that no investor fee was to be paid at the time of reconveyance. (Smith Aff. Ex. 2 at ¶ 3.) Yet, $8,000 was listed on the HUD-1 Settlement Statement to be paid to MPV for its investment services. First Union failed to address this fact in its Reply brief other than to generally state that the closing was carried out in accordance with the lender's instructions.

In sum, the evidence presented by Plaintiff is sufficient to create a genuine issue of material fact regarding whether the Vandergons, CRM and First Union had a mutual understanding for a common purpose. Plaintiff has presented evidence that: the Vandergons, CRM and First Union worked together on more than one foreclosure reconveyance transaction; that the Vandergons and/or CRM insisted on using First Union as the closing agent; that Matthew Vandergon's company, MPV, received an investor fee of $8,000 when the Investor Agreement between Plaintiff and Lisa Vandergon indicated that there would be no investor fee is sufficient to create a genuine issue of material fact. These facts are enough to allow a reasonable jury to conclude that First Union, CRM and the Vandergons worked together to carry out foreclosure reconveyance transactions and thus

had a mutual understanding for a common purpose.

First Union cites to *Witzman v. Lehrman, Lehrman & Flom, et al.* in support of its position that First Union should be granted summary judgment. 601 N.W.2d 179 (Minn. 1999). In that case, the Minnesota Supreme Court held that a claim for aiding and abetting against a professional is subject to a heightened pleading standard. *Id.* at 189. That is, a plaintiff must allege specific facts that the professional had actual knowledge a tort was being committed by the professional's client. *Id.* First Union asserts that Plaintiff has not alleged any facts suggesting that First Union had knowledge that the Vandergons and the other Defendants were violating the statute. Assuming but without deciding that *Witzman* applies to this case, Plaintiff has alleged with sufficient particularity facts to suggest that First Union had knowledge of at least some of the statutory violations. Plaintiff alleges that MVP was given an $8,000 consulting fee even though the contract signed between Plaintiff and Lisa Vandergon states that no investment fee was to be paid. The $8,000 fee was entered on the HUD-1 form prepared by First Union and, according to that document, the money was paid to MVP. These facts are plead with sufficient particularity as to suggest that First Union had some knowledge of the alleged wrongdoing.

> **2. There is a genuine issue of material fact regarding whether the Vandergons, CRM and First Union had a right to a voice in the direction and control of the means used to carry out the common purpose.**

The second issue is whether the Vandergons, CRM and First Union had a right to a voice in the direction and control of the means used to carry out the common purpose. Here, CRM was a company responsible for placing mortgages and thereby played a critical role in the financing of the foreclosure reconveyances. The Vandergons acted as foreclosure consultants and purchasers in the various transactions and therefore were central to these transactions. Finally, First Union

exercised control by carrying out the closings which included acting as escrow agent in charge of collecting and distributing money. Given the roles of the various parties, a reasonable jury could conclude that each party had a voice in the direction and control of the means used to carry out the common purpose.

## IV. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** First Union Title and Real Estate Services, LLC, Michael Kielty, and Michelle Hutton's Motion for Summary Judgment [#40] be **DENIED**.

DATED: April 23, 2009  *s/ Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 12, 2009**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **May 12, 2009,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.